**Joseph J. HURST, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 22399.**

United States Court of Appeals
Fifth Circuit.

Jan. 5, 1967.

Rehearing Denied Feb. 16, 1967.
See 371 F.2d 1018.

B. H. Chappell, Columbus, Ga., Jesse G. Bowles, Cuthbert, Ga., Jackson Cook, Ellis Arnall, Atlanta, Ga., Foley, Chappell, Young, Hollis & Schloth, Columbus, Ga., Arnall, Golden & Gregory, Atlanta, Ga., for appellant.

Floyd M. Buford, U. S. Atty., Macon, Ga., for appellee.

Before BROWN and COLEMAN, Circuit Judges, and GARZA, District Judge.

COLEMAN, Circuit Judge:

Appellant stands convicted by a jury of conspiracy to violate various sections of the Internal Revenue Code relating to nontax-paid whiskey and he was also convicted on one of three counts charging substantive violations of the same statutes. There had been a prior trial of the case in which he was convicted on the conspiracy count and the three substantive counts. Because the Government had been permitted to introduce in evidence records dealing with prior offenses, some only charged and others proven, in no way connected with the charges for which defendant was then being tried, these convictions had to be reversed, 337 F.2d 678. This Court there held that the evidence of conspiracy and substantive violations, although not strong, was sufficient to warrant submission to a jury.

On this second appeal the evidence appearing in the trial transcript has been most thoroughly examined. Although the original weaknesses remain, the government was again able to produce enough proof to avoid a court ordered acquittal, especially in view of a particularly incriminating conversation of appellant which took place on April 22, 1963, and which will hereinafter be set forth in detail.

The indictment charged that the appellant conspired with the county sheriff and several professional liquor violators but there was no direct proof of a specific conspiratorial agreement. Appellant was never placed personally in the act of possessing any whiskey, transporting any whiskey, or taking pay for any whiskey. At the insistance of government agents, he once took $100 for the requested purpose of delivering it to the sheriff and the proof conclusively shows that he did so deliver it instead of keeping it for himself. The pursuit, investigation, and apprehension of appellant was accomplished by several agents of the Treasury Department, Alcohol Tax Unit, in which

the key role was played by an under-cover informer. This informer had previously been personally acquainted with appellant in regard to the illicit liquor business, as will later be seen in connection with another point, and had been convicted of liquor violations.

By and large, the proof revolved around the sayings and doings of these participants, the pursuers and the pursued. A detailed recitation of the trips made by informer and agents to appellant's home, conversations between them, telephone calls, automobile journeys made in search of whiskey, and other lesser elements in this otherwise routine liquor case would require copying the trial record. The extensive details would constitute no contribution to jurisprudence in this particular field. We note that appellant never attempted at any time to make contact with the informer or the agents. They always sought him out, mostly at his home, generally at night, and after he had gone to bed. Entrapment, however, was not raised as a defense.

As to the sufficiency of the evidence, the case would be exceedingly close, if not clearly reversible, had it not been for a highly incriminating statement made by the appellant on April 22, 1963, of which indisputable proof was preserved by the use of a tape recording.

This recording was made without the knowledge of the appellant and later produced on the witness stand. It was secured in the following manner:

About 9 o'clock on the night of April 22, 1963, the informer and an agent went to the home of appellant, where they found him sprinkling the yard. The informer asked the appellant, "Did you ever find me any stuff?" Appellant thought a minute and replied, "Bennett ought to be back up. Let me get my shirt and I'll take you out there." The station wagon, driven by the informer, had a midget tape recorder on the front seat, concealed in a package similar to a shoe box. While appellant was going for his shirt, the agent turned this recorder on. Of course, appellant was not warned

and did not know that the conversation, on the way to Bennett's, was being recorded. No liquor was found there. The agent testified that while on the way out they were discussing the matter of protection for the liquor business in Quitman County, and appellant said, "Hammond can't guarantee you anything. *I can guarantee you, so long as the sheriff and I are the only ones that know about it, nothing will happen to you in Quitman County."*

While he was on the witness stand, the agent physically identified the tape (recording) but it was not played at that time. After this witness was excused the United States Attorney announced, " * * * our next proposal, next evidence, is to play the recording". He further stated "your Honor please, we have Mr. Jim Weaver here of Columbus, who is in this type of business, operating these machines, I know nothing about them; and I asked him to play the tape for us located in the box identified as G-3".

Counsel for the appellant objected to the use of the tape "because it's not a complete record of what was said at that time. If the court reporter can't understand it after several attempts to play it, we submit that it is incomplete and inaudible and, therefore, may be deceptive and prejudicial in this case, and we object to its playing on that ground".

Appellant further suggested that the tape ought not to be played because it simply covered evidence already given by two government witnesses, and, therefore, would add nothing to the trial.

The court overruled the objections and allowed tape recording G-3 to be "played to the jury".

The court reporter's transcript of the recording shows that many extraneous, irrelevant, and probably prejudicial things were discussed by appellant, informer, and agent, such as the activities and unreliability of another alleged liquor operator, how the sheriff had taken care of that operator, how bootlegger Bennett had given appellant a mighty

good gallon the other night, about how Bennett had had five big stills "cut down", how the informer had had an automobile confiscated from him, about the legalization of mixed drinks in Georgia, during which time appellant stated that although he was a Legislator from a dry county he could vote wet, that they might not pass "that dam thing", and if "that crowd will put the money in there like they promised to, it could pass. I think they've got the dam money, to tell you the truth". *None of this was objected to in any fashion.*

The recording, in the voice of the appellant, then revealed the following conversation about "protection" in Quitman County:

"Informer. He (meaning Hammond) wanted to guarantee me to the Russell County line for 50¢ extra and I agreed to do it, but you know how his guarantee was, don't you?

Appellant. Hell, his guarantee was worthless. He wouldn't—

Informer. I wouldn't believe him, nothing he says.

Appellant. He's got no way to guarantee it. Couldn't guarantee anybody out of the yard.

Informer. That's right. But you know whenever—

Appellant. *I can guarantee you in Quitman County if don't nobody know it but the sheriff".*

It must be pointed out that on quite a number of other occasions the informer or agents, were secretly equipped with concealed microphones or transmitters which broadcast conversations to other agents lurking nearby. Appellant vigorously criticizes this procedure, although the conversations obtained in that manner are not so damagingly incriminating as the one taken down by the secret tape recording.

On appeal, an effort is made to raise Constitutional questions under the Fourth, Fifth, and Sixth Amendments. Appellant says that, although there was no objection below, the admission of the evidence as above obtained was plain error under F.R.Crim.P. Rule 52(b).

On Lee v. United States, (1952) 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270, was a case in which the defendant made damaging admissions to a trusted "friend" who, unknown to him, was an undercover agent. This undercover agent carried a concealed microphone which allowed another agent, outside the building, to overhear the conversation. This agent was allowed to testify to what he heard. The Supreme Court, by a divided vote, held that this procedure did not violate the Fourth Amendment.

Again by a divided vote, the Supreme Court in Lopez v. United States, (1963) 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462, held that a wire recording of a conversation between a defendant and a government agent, taken during an attempt to bribe that agent, was properly admitted in evidence; that the secret making of the recording did not violate petitioner's rights under the Fourth Amendment; and that the Supreme Court would not prevent the introduction of the recording by the exercise of its supervisory powers, there being no improper conduct by federal officials. There was a powerful dissent, concurred in by three Justices. It will be noted that in *Lopez* the defendant knew he was speaking with an officer of the United States.[1]

*On Lee* and *Lopez* were decided on Fourth Amendment grounds. Apparently no Fifth Amendment question was raised. This question, however, has been before United States Courts of Appeals in other circuits. In Todisco v. United States, (9 Cir. 1961) 298 F.2d 208, cert.

I. After this opinion had been written but not published the Supreme Court granted certiorari in Osborn v. United States. Since Lopez v. United States appeared to be directly involved, we withheld further action pending the Supreme Court decision. That decision, rendered December 12, 1966, prompts no change in the views already agreed upon and herein expressed, Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 439, 17 L.Ed.2d 394.

denied, 368 U.S. 989, 82 S.Ct. 602, 7 L.Ed.2d 527, defendant was convicted of an attempt to bribe an internal revenue agent. Without the defendant's knowledge a conversation between the defendant and the agent was recorded by an agent using a miniature radio transmitter. The court held that there was no merit to a Fifth Amendment objection because * * * "appellant was not confessing to a crime. He was committing one. Even if there were self-incrimination, it was wholly voluntary".

United States, Appellee v. Beno, Defendant-appellant, (2 Cir. 1964) 333 F.2d 669, was a case in which a tape recording of conversations with the defendant, secretly taken, was played to the jury. The Court held Fifth Amendment contentions to be without merit, that the words constituted the commission of the crime itself, the defendant was at that moment violating the law, that if the witness could testify as to the dialogue between the defendant and himself then there would seem to be no reason why the recorded version, far more accurate, could not be introduced and played to the jury, citing United States v. Kabot, (2 Cir. 1961) 295 F.2d 848, cert. denied, 369 U.S. 803, 82 S.Ct. 641, 7 L.Ed.2d 550.

■ Regardless of strongly entertained differences of opinion in this area, both lay and judicial, it all boils down to this: the prior decisions require a holding that the use of these recording devices did not here violate appellant's Constitutional rights.

The Supreme Court has specifically declined to exercise its supervisory powers to prohibit the use of testimony obtained as here by concealed microphones. Consequently, we do not feel that this court should consider such a supervisory rule.

As to the use of the secret microphones, transmitters, and recording machines, we must emphasize that appellant's statements, there recorded or there overheard, were not recitations of past crimes. At the time of utterance and recordation they were elements, or likely elements, of a crime in the course of commission. Appellant was not then under detention or compulsion of any kind. He was acting of his own free will and accord, although under the mistaken belief that he was dealing with "friends" instead of government agents. He had not been formally charged with any offense nor taken into custody. This was not an *Escobedo* [Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977] or *Massiah* [Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246] situation. We perceive no invasion of appellant's Constitutional rights against self incrimination under the Fifth Amendment or right to counsel under the Sixth Amendment.

■ An important question is seriously pressed with reference to the admission of testimony concerning an occurrence which took place about ten months before the earliest accusatorial date laid in the indictment. At the very outset of the trial, over strenuous objection from the defendant, the government was allowed to offer proof that on March 8, 1962, the informer, Kennington, was caught redhanded in the transportation of thirty-two gallons of whiskey, that he was tried the same date at a store belonging to the accused sheriff, and fined $400. It was further shown that appellant later drove up in the company of Hammond (the man later named in the tape recording), after which he sent word, by Hammond, to the arresting *state* officer "to bring that car and whiskey back right away". It was promptly done. By the intervention of this appellant, Kennington got his vehicle and whiskey back, but was promptly arrested again as soon as he crossed the river out of Georgia and into Alabama. The next day appellant went to Eufaula and signed Kennington's appearance bond.

If this appellant had been on trial for some crime other than violating and conspiring to violate laws relating to nontax-paid whiskey, and if the admissibility of this proof depended on "background purposes, and for that purpose only", (the reason given by the trial court for admitting it) there would be

clear necessity for reversal, Michelson v. United States, (1948) 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168. It was there said:

"Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt". [Citations omitted.]

"The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime".

[Exceptions: when a prior crime is an element of the later offense or the establishment of fraudulent intent is involved.]

"The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge".

The decisive factor on that point in this case is that *the government's proof did not stop with the introduction of this testimony.* Later proof described what took place on April 22, 1963, when the appellant voluntarily made the trip to bootlegger Bennett's. There the conversation dealt squarely with the protection activities of that same Hammond who first went with the appellant to the sheriff's store and who then delivered the appellant's message to the state officer which resulted in the return of the automobile and the whiskey. Moreover, appellant was then and there talking directly with the same Kennington who lost the whiskey and then recovered it by "order" of the appellant. It might have been better trial practice for the government to have introduced the proof of what occurred on April 22, 1963 before presenting the testimony as to what

happened on March 8, 1962. In any event, the case was submitted to the jury on *all the proof* and we do not find reversible error in this regard. Weiss v. United States, (5 Cir. 1941) 122 F.2d 675, cert. denied 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1942), rehearing denied 314 U.S. 716, 62 S.Ct. 478, 86 L.Ed. 570 (1942).

We note the decision of this court in Roe v. United States, (5 Cir. 1963) 316 F.2d 617, 623, in which it was said:

"For the law must protect against the human tendency to conclude that birds, like words, are frequently judged by the company they keep—*noscitur ex socio*. But despite the adverse implications—often spectacular and occasionally inflammatory—from proof showing commission of some crime other than the one being tried, the law does not accord an automatic immunity from such evidence. Care must, of course, be taken to keep such evidence in proper bounds. If it has no connection with any elements of the offense being tried, it may not be introduced merely to cast the defendant in a bad light. In the words of Judge Hutcheson, it may not be used merely to 'give a dog an ill name and hang him'. Olinger v. Commissioner, 5 Cir. 1956, 234 F.2d 823, 824; Goldberg v. Commissioner, 5 Cir. 1956, 239 F.2d 316, 321. But it is essentially a question of relevance. And it is now clear that evidence that is relevant to prove one crime does not become inadmissible because it also proved another."

Able counsel for the appellant have striven most diligently in his behalf. In addition to the points already disposed of they complain of certain instructions to the jury and the failure to give others. A careful reading of the charge reveals no reversibly prejudicial inclusion or omission. The other specifications of error have been duly considered but cannot be sustained.

The judgment of the District Court is Affirmed.