[Crim. No. 15221. In Bank. Nov. 27, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
SEAN J. MURPHY, Defendant and Appellant.

## COUNSEL

Robert E. Burke, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Frederick R. Millar, Jr., Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—On October 1, 1969, defendant Sean J. Murphy was charged jointly with Warren O. Saling by indictment with conspiracy to commit first degree murder (Pen. Code, § 182) and the first degree murder of defendant's wife, Catherine Murphy (Pen. Code, §§ 187, 189). Defendant pleaded not guilty. His motion for severance was granted and after trial a jury found him guilty as charged and fixed the penalty at

death. His case is before us on automatic appeal (Pen. Code, § 1239, subd. (b)).[1]

■■■ Defendant contends that (1) certain extrajudicial statements made by him which were recorded on a concealed electronic device and photographs of his deceased wife were erroneously and prejudicially received at trial; (2) he was deprived of his constitutional right to present a defense; and (3) the exclusion of certain jurors for their unwillingness to impose the death penalty resulted in a "guilt prone" jury and the denial of a fair trial.[2] We have determined that these contentions lack merit and therefore have concluded that the judgment as hereinafter modified must be affirmed.

On the evening of August 22, 1969, William Mulhearn was driving on Lopez Canyon Road in the County of Los Angeles and was "flagged down" by defendant. Mulhearn noticed that defendant had blood on his head and T-shirt and observed a woman's body lying on the ground near a vehicle. Defendant told Mulhearn that the woman, his wife, had been "beat up" and asked him to call the police.

Deputy Sheriff Jack Boggio, who arrived in response to the call, observed that the woman was dead and that defendant appeared to be injured. Defendant told Boggio that while he was driving southbound on Lopez Canyon Road he observed a red car on the side of the road with two men standing beside it, and he stopped to offer help. The men said they had run

---

[1]Saling's separate trial also resulted in a conviction and imposition of a death sentence. Because of prejudicial error in the trial of that cause we reversed the judgment. (*People* v. *Saling* (1972) 7 Cal.3d 844 [103 Cal.Rptr. 698, 500 P.2d 610].) The proceedings in both cases occurred prior to our decision in *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880].

[2]Defendant also contends that (1) a prospective juror was improperly excused under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], (2) the jury was erroneously given the impression that there were "proper cases" for imposition of the death penalty, (3) the dismissal of jurors who were opposed to the death penalty created an unconstitutionally biased "hanging jury," and (4) the death penalty is unconstitutional. In view of our holding in *People* v. *Anderson, supra*, 6 Cal.3d 628, the first three of these contentions need not be discussed; with respect to the last contention, we herein modify the judgment to provide a punishment of life imprisonment instead of death. (*Infra*, p. 368.) Although the electors at the November 7, 1972, General Election adopted Proposition 17 which added section 27 to article I of the Constitution purporting to nullify *Anderson's* holding of the invalidity of the death penalty, the constitutional prohibitions against ex post facto laws (U.S. Const., art. I, § 10; *Kring* v. *Missouri* (1882) 107 U.S. 221 [27 L.Ed. 506, 2 S.Ct. 443]; Cal. Const., art. I, § 16) preclude the application of the amendment to cases arising before its effective date (see Const., art. IV, § 1). Moreover, imposition of the death penalty in the circumstances of the instant case would infringe federal constitutional prohibitions. (*Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726].)

out of gas and asked defendant to drive them to a service station. After traveling a short distance one of the men pointed a pistol at Catherine Murphy, told the Murphy's they were being robbed and ordered defendant to pull over, stop and get out of the car. One of the men later hit defendant on the head. Apparently Boggio did not pursue the matter further and secured the area for investigating officers who were en route.

Upon his arrival Deputy Sheriff Barrett Fitzgerald found the lifeless body of Catherine Murphy lying near the Murphy automobile and a pool of blood extending from behind a nearby bush to the body's location. Fitzgerald walked north-bound up the canyon road about one quarter of a mile and found on the shoulder of the road fresh impressions left by tires which were similar in measurement and design to those on defendant's car. He also found a second set of impressions left by tires similar to those on a maroon 1963 Pontiac which, subsequent investigation disclosed, had been driven by Saling. The officer's investigations and conclusions relative to the vehicles driven by defendant and Saling were corroborated by the testimony of a criminalist, who also testified that the maroon Pontiac appeared to have been turned around and driven northbound up the canyon at that point.

An autopsy performed on Catherine Murphy's body revealed that she had received five stab wounds, any one of which would have been fatal, and the autopsy surgeon determined that the cause of her death was exsanguination.

Several hours after the homicide Fitzgerald interviewed defendant after advising him of his constitutional rights. Defendant said that he had been planning to purchase a house trailer and that Jerry Carnes had informed him that one was for sale in Kagel Canyon. Defendant and his wife drove up Kagel Canyon Road to look for the trailer. Being unable to find it they decided to drive down Lopez Canyon Road (which joins Kagel Canyon Road near the summit of the elevation) on their way home. Defendant then gave essentially the same account he had earlier related to Boggio, but this time he stated that the men who stopped him were driving a 1957 maroon Chevrolet. He added that after he was told to pull off to the side of the road and to stop the car he was further instructed to back up the car to a wide area of the road. Defendant and his wife were then told to alight from the car. One of the two men opened the trunk and removed a tire iron while the other man forced defendant and his wife behind a bush. The man with the tire iron then came to their location and hit defendant on the head, rendering him unconscious. When he regained consciousness he heard his wife moaning and found her behind the bush.

Defendant dragged her to the point where she was later seen by Mulhearn and the police.

During the course of his investigation Fitzgerald obtained statements from Jerry and Richard Carnes, Jim and Susie Armstrong and a man named Rodriguez. The Carnes brothers told him that defendant had approached Jerry and asked him if he would become involved in a "rough-up job" which ultimately developed into a plan to murder defendant's wife. Jim Armstrong told Fitzgerald that he had been approached by Saling and was offered $300 to steal a car and drive it into Big Tujunga Canyon where it was to be used in a planned hit-and-run accident. Susie Armstrong told Fitzgerald that she was present in her apartment on two occasions when Saling was there and on those occasions she overheard conversations concerning a traffic "accident" which was to take place in Big Tujunga Canyon. The man named Rodriguez told Fitzgerald that he was present on two different occasions when Saling had money and talked about a hit-and-run accident.

On the evening of September 18, 1969, Jerry Carnes telephoned Fitzgerald and asked him to come to Carnes' apartment for the purpose of listening to a telephone conversation which Carnes was about to have with defendant.[3] Fitzgerald listened to the conversation with the aid of an induction coil and, with Carnes' consent, recorded the conversation with an electronic recording device. On September 19 Jerry Carnes' brother, Richard, authorized Deputy Sheriff William Allen to conceal a transmitting device in Richard's clothing and to intercept and record a conversation between him, his brother and defendant.[4]

Jerry Carnes was granted immunity from prosecution and testified, contrary to defendant's story, that sometime in the latter part of July or early August 1969, defendant telephoned him at the cycle shop where he was employed and asked whether he wanted to "rough somebody up that [sic] owed [defendant] some money." Carnes replied that he did not do that type of thing but "may [know] somebody that [sic] would." Defendant subsequently inquired of Carnes' progress on two occasions. The second

---

[3]Although not a part of the record in the instant case it was established in the prosecution against defendant's coconspirator (*People* v. *Saling, supra,* 7 Cal.3d 844) that sometime after August 29, 1969, Jerry Carnes was arrested for conspiracy in the murder of Catherine Murphy and held for three days, and released apparently to assist in the investigation.

[4]Both recordings contain damaging admissions which persuasively establish that defendant initiated and participated in a conspiracy to murder his wife. (See pp. 356-358, *infra.*)

inquiry was on a Friday, two or three days after defendant's initial phone call. Carnes told defendant that he still had not found anyone but was going to visit a person who might be able to help him and asked defendant to call back later.

After the phone call Carnes contacted Warren O. Saling, whom he also knew as "Dusty." Saling told Carnes that he was interested and that he wanted to talk with defendant. About one hour later Carnes and defendant went to Saling's home. Carnes did not pay close attention to the conversation between defendant and Saling but while driving back to the cycle shop defendant told him they were going to rehearse that afternoon about 2 or 3 p.m., with the plan to be carried out about 8 p.m. that night in Big Tujunga Canyon. Defendant said he was going to drive the victim into the canyon and pretend to have a flat tire. He would then stop the car on the side of the road and have the victim remove the lug nuts while he removed the spare tire from the trunk. Saling would then approach in his car and drive into or over the victim. If he failed the first time he would "just come back and hit 'em on the head and lay him on the road and run over him." Carnes was to call the police after the accident, claiming to be a witness. He was eventually told that he would be paid for his role. Carnes said that, during the course of their conversation, defendant said "her" one or two times when referring to the prospective victim.

Later that same day Carnes, Saling, and defendant went to Big Tujunga Canyon in Saling's maroon Pontiac and rehearsed as planned. Still later, about 7:45 p.m., Carnes drove to the canyon and parked at his predesignated spot. After about 40 minutes he saw defendant drive into the canyon with a woman in the car. Defendant, waiting for Saling, drove back and forth past Carnes four or five times but Saling did not appear. Carnes left about 9 p.m. and shortly thereafter encountered Saling and Robert "Pokey" Jurgenson as they were driving toward the canyon. Saling stopped and said he was late because the police had detained him and stated he would contact Murphy later. Apparently nothing more was said concerning the execution of the plan. Carnes then went to the home of his girlfriend's mother and, thereafter, did not see Saling. Catherine Murphy was killed that Friday evening in Lopez Canyon.[5]

Carnes heard about the homicide on the Monday following Catherine's death. Approximately one week later Richard Carnes brought his brother

[5]The record is silent as to what happened between the time Carnes met Saling and Jurgenson and the events immediately prior to the murder. Moreover, the record does not indicate how Saling and Jurgenson knew, if they did, that defendant would shortly thereafter be driving through Lopez Canyon.

Jerry $200 and told him that it was from defendant. About one or two weeks thereafter defendant met with Jerry to find out whether the police had contacted him. Jerry said that they had and defendant told him to "keep [his] mouth shut because the Courts wouldn't take the word of two dopers [referring to Saling and Jurgenson]."

Jerry Carnes' account of the foregoing events was corroborated in a number of significant respects by other testimony and the tape recordings played before the jury. A teller from the bank in which the Murphys deposited their savings testified that on the 15th, 22d and 29th of August 1969, defendant withdrew $100, $300 and $500, respectively. Richard Carnes testified that on one occasion he overheard a conversation between his brother and defendant concerning "somebody getting roughed up." Richard further testified that about two weeks after the homicide he received $700 from defendant for his brother and Saling. A babysitter for Saling's common law wife testified that in August 1969 Jerry Carnes, Robert "Pokey" Jurgenson and defendant visited the Saling residence and conferred with Saling. A former used car dealer for whom Saling occasionally worked testified that about the first week in August 1969 he loaned Saling the maroon Pontiac allegedly used during the perpetration of the murder. The car was returned on the Monday following the homicide. There was other testimony which tended to establish that defendant had reason to bring about his wife's death. A woman who lived across the street from the Murphys testified that during 1969 she was having an extramarital affair with defendant which terminated about three or four months prior to his wife's death. A friend and neighbor of the Murphys related that during the first part of August 1969, defendant and his wife stated that they wished to move from the neighborhood to terminate further relations between defendant and his paramour.

Additionally, it was established that defendant had purchased a $13,850 insurance policy (issued on January 15, 1969) on his wife's life naming himself as primary beneficiary. There was evidence, moreover, that defendant had completed the application for the policy without his wife's knowledge and had forged her name thereto. There was also evidence from which the reasonable inference could be drawn that defendant had forged his wife's name on various cards authorizing the payment of premiums on drafts drawn by the insurance company on funds maintained in the Murphys' account.

Further testimony established that another insurance company on November 8, 1968, had issued a $10,000 insurance policy, with a double indemnity clause, on the life of Mrs. Murphy with defendant as the primary

beneficiary. After his wife's death, the sum of $20,000 was paid to defendant on this policy. The same company in 1963 had issued a family policy with double indemnity provisions insuring the lives of members of defendant's family. Mrs. Murphy was insured for $1,250; the company paid $2,500 to defendant upon her death. A third company carried the Murphys' automobile insurance which, among other things, provided for a $15,000 indemnity to the survivor in the event either insured was killed by a hit-and-run driver.

As stated, both tape recordings contain extremely damaging admissions which persuasively establish that defendant initiated a conspiracy involving Robert "Pokey" Jurgenson, Jerry Carnes and Warren O. Saling and that Catherine Murphy was killed as a result of that conspiracy.[6] The recorded conversations recount in lurid detail many of the events during the killing, the unabashed but cautious attitude of the conspirators, the progress being made by the investigating officers and the manner in which the suspects should conduct themselves in order to frustrate the investigation. Great concern is expressed that they keep their stories consistent. Comment is made that Saling was to "take the rap without involving anybody else" in the event "anything went wrong" and that he was "pretty scared." Anxiety is expressed when it appeared that Saling had returned from some undesignated place and might still have in his possession "the knife" and the victim's credit cards. Defendant indicates that Saling "had everything in his pocket. . . . [and defendant had not] laid eyes on the guy since that night." During one segment defendant relates to Jerry and Richard Carnes that after hearing Jurgenson "was about to shoot [him at the scene of the killing because he was] making him nervous" and after observing that Saling and Jurgenson was not going to "use the gun" as apparently had been planned, he was convinced that "something [had gone] wrong." Defendant also states, inconsistently with his statements to the investigating officers, that "I laid her down there—[she was] unconscious at this stage but the blood was still coming from the jugular vein—it looked like you just turned on a faucet in a house." When Jerry Carnes indicates that he would have been nauseated, defendant mentions that it was for such reason that defendant did not want Jerry to be present. Defendant indicates that he had not "changed one of [his] habits" and that if he were picked up by the police he would "laugh at them" because they did not have the murder weapon, no fingerprints were left on the tire iron, and they simply could

---

[6]It has not been called to our attention what charges were made against Jurgenson. In the second recorded conversation (between Jerry and Richard Carnes and defendant) defendant purportedly states, at a time before Saling and defendant were indicted, that Jurgenson was "sent . . . up on parole violation and narcotics possession."

not prove anything. It is observed that the police had not let up in their investigatory efforts and defendant noted that that was favorable since "the more they pressure you it means the less they have on you." Defendant also comments that three sheriff's deputies were keeping him informed of the progress of the investigation. Finally, defendant states that "as long as the three of [them stuck] to [their] story . . . [the police had] nothing," and even if Saling and Jurgenson were apprehended the police would not believe their stories since they were heroin addicts. It is speculated, however, that if they are not careful, all of them will end up "in the chair . . . [a]s a matter of fact, they would probably put three more chairs up there."

Defendant called only two witnesses to testify on his behalf during the guilt phase of the trial. Charles O'Neill stated that defendant's automobile insurance policy was first sold to him in 1967 and had been renewed yearly since that time; that it was O'Neill who suggested the accidental death coverage; and that the amount purchased was not the maximum obtainable. Connie Saccomando, a neighbor of the Murphys' and a close friend of Catherine Murphy, confirmed that the Murphys were having problems with their marriage during 1969, principally because defendant was engaged in an extramarital affair at the time. She further testified that Mrs. Murphy frequently ingested sleeping pills and tranquilizers, that defendant told the witness he was afaid his wife would take an overdose and that on nights when Mrs. Murphy would "wander off" defendant and the witness would go looking for her. With respect to defendant's extramarital affair, Mrs. Saccomando testified that defendant had told her he had planned to move and that things seemed to improve between the Murphys after that. On cross-examination she stated that defendant told her that he loved the woman he was seeing and would marry her if he could.

### Admissibility of the Tape Recordings of the Conversations with the Carnes Brothers

Defendant initially contends that the tape recordings of the conversations between him and the Carnes brothers made on September 18 and 19 were obtained in violation of his Fourth Amendment rights and were erroneously and prejudicially received at trial. We disagree.

Citing *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], defendant argues that prior judicial approval was required in order to lawfully record his conversations with the Carnes brothers.[7] It

---

[7]Defendant does not claim that the recordation of these conversations violated federal or state statutes. (See title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520) and Pen. Code. §§ 630-637.2.)

is beyond dispute that *Katz* requires a narrowly drawn search warrant to be obtained prior to surreptitious surveillance of a conversation between persons exhibiting a reasonable expectation of privacy with respect thereto. It is equally clear, however, that the requirements outlined in *Katz* were intended to protect such persons only from the "uninvited ear" (*Katz v. United States, supra,* 389 U.S. 347, 352 [19 L.Ed.2d 576, 582]), not from a breach of trust by one of the parties to the conversation (see *United States v. DeVore* (4th Cir. 1970) 423 F.2d 1069, 1073-1074; *Koran v. United States* (5th Cir. 1969) 408 F.2d 1321, 1323-1324; *United States v. Kaufer* (2d Cir. 1969) 406 F.2d 550, 551-552; *Holt v. United States* (10th Cir. 1968) 404 F.2d 914, 920).

In *Hoffa v. United States* (1966) 385 U.S. 293 [17 L.Ed.2d 374, 87 S.Ct. 408], *Lopez v. United States* (1963) 373 U.S. 427 [10 L.Ed.2d 462, 83 S.Ct. 1381], and *On Lee v. United States* (1952) 343 U.S. 747 [96 L.Ed. 1270, 72 S.Ct. 967], the Supreme Court upheld convictions based on evidence obtained by or with the consent of persons in whom the defendants had confided.[8] Recently the plurality opinion of *United States v. White* (1971) 401 U.S. 745 [28 L.Ed.2d 453, 91 S.Ct. 1122] reaffirmed the vitality of those cases, stating, "*Katz* . . . [did not] indicate in any way that a defendant has a justifiable and constitutionally protected expectation that a person with whom he is conversing will not then or later reveal the conversation to the police." (*Id.* at p. 749 [28 L.Ed.2d at p. 457].) It therefore concluded that a search warrant for the purpose of secret surveillance is not required in such circumstances.[9]

---

[8]In *Hoffa* a former associate of the defendant turned informer in exchange for leniency on criminal charges pending against him. At the suggestion of federal authorities the informer obtained an invitation to confer with the defendant in his hotel suite about certain matters. The informer later reported incriminating statements made by the defendant which helped convict him. In *Lopez* the petitioner attempted to bribe an Internal Revenue Agent to avoid a certain tax liability. The agent pretended to accept the bribe and in a second meeting, during which the agent was equipped with a transmitter and pocket recorder, discussed the payoff with the petitioner and recorded the conversation. In *On Lee* an old acquaintance and former employee of the defendant, who had become an undercover agent for the Bureau of Narcotics, engaged the petitioner in a conversation during which petitioner made incriminating statements. The agent was wearing a microphone which transmitted the conversation to agents who were stationed outside with a receiving set. The conversation was recorded and later helped to obtain petitioner's conviction.

[9]For purposes of constitutional analysis we here make no distinction between the telephone conversation on September 18 and the face to face conversation on September 19. The Supreme Court has held that one party to a telephone conversation may constitutionally allow another to listen to it. (*Rathbun v. United States* (1955) 355 U.S. 107 [2 L.Ed.2d 134, 78 S.Ct. 161]; *Rogers v. United States* (10th Cir. 1966) 369 F.2d 944, 946; *United States v. Ballou* (2d Cir. 1965) 348 F.2d 467, 468; *Lindsey v. United States* (9th Cir. 1964) 332 F.2d 688, 691.) This view is also supported by title III of the Omnibus Crime Control and Safe Streets Act of 1968. (18 U.S.C. § 2511(2)(c).)

Defendant insists, however, that although he may not have had a reasonable expectation that Jerry or Richard Carnes would not testify to their conversations with him in court (see *United States* v. *White, supra,* 401 U.S. 745, 751 [28 L.Ed.2d 453, 458-459]), he at least had an expectation that their conversations were not simultaneously being heard and recorded by the police. We, as the plurality in *White,* perceive no distinction between the risk one faces that the person in whom he confides will later breach that trust by testifying about the conversation and the risk that such person has already betrayed him and is instantaneously transmitting their conversation electronically to police equipped with radio receivers. (*Id.*) Facing a somewhat similar claim, Mr. Justice Harlan in *Lopez* v. *United States, supra,* 373 U.S. 427, 439 [10 L.Ed.2d 462, 471], stated: "Stripped to its essentials, petitioners's argument amounts to saying that he has a constitutional right to rely on possible flaws in the [Internal Revenue] agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible to impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory. We think the risk that petitioner took in offering a bribe to [the agent] fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." (*Id.* at p. 439, fn. omitted [10 L.Ed.2d at p. 471].)[10]

Defendant attempts to distinguish *Lopez* because there the Internal Revenue agent "was openly that at all times" and the defendant therefore assumed a substantial risk that the agent would refuse the bribe and later reveal it. Under the facts of this case that distinction is not compelling. Here, defendant was well aware of the risk involved in conversing with the Carnes brothers. In fact, the thrust of his conversation was to persuade

---

[10]We think the words of Mr. Justice White aptly describe the circumstances with which defendant was confronted:

"Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police. If he sufficiently doubts their trustworthiness, the association will very probably end or never materialize. But if he has no doubts, or allays them, or risk what doubt he has, the risk is his. In terms of what his course will be, what he will or will not do or say, we are unpersuaded that he would distinguish between probable informers on the one hand and probable informers with transmitters on the other. Given the possibility or probability that one of his colleagues is cooperating with the police, it is only speculation to assert that the defendant's utterances would be substantially different or his sense of security any less if he also thought it possible that the suspected colleague is wired for sound. At least there is no persuasive evidence that the difference in this respect between the electronically equipped and the unequipped agent is substantial enough to require discrete constitutional recognition, particularly under the Fourth Amendment which is ruled by fluid concepts of 'reasonableness.' " (*United States* v. *White, supra,* 401 U.S. 745, 752-753 [28 L.Ed.2d 453, 459].)

Jerry and Richard Carnes to stick to their stories and not to "break" under police questioning.

Defendant also urges that *Lopez* may be distinguished on the ground that the tape recording there was not used to supply testimony incapable of cross-examination; rather, it was used to corroborate the testimony of the government agent. He adds that although the Carnes brothers testified. they did not testify to the statements in the recordings and the tapes therefore were not truly corroborative of their testimony. We reject such a wooden approach. When the Carnes brothers testified at trial they were subject to cross-examination about any aspect of the case, including the recorded conversations. While the informant in *White* did not testify the court observed that "[n]o different result should obtain where . . . the informer disappears and is unavailable at trial; for the issue of whether specified events on a certain day violate the Fourth Amendment should not be determined by what later happens to the informer." (*United States v. White, supra*, 401 U.S. 745, 754 [28 L.Ed.2d 453, 460].)

■ ■ Since Jerry Carnes requested that his telephone conversation with defendant be recorded and since Richard Carnes consented to wear a transmitter during his conversation with his brother and defendant on September 19, the trial court properly received both recordings.

Defendant argues that the recordings were obtained in violation of his Fifth Amendment (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) and Sixth Amendment (*Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]) rights. The *Miranda* decision was prompted in part by a recognition of the dangers inherent in "incommunicado interrogation of individuals in a police-dominated atmosphere." (384 U.S. at. p. 445 [16 L.Ed.2d at p. 707].) Its main concern is with the psychological impact upon the in-custody suspect whose liberty is being restrained (*id*. at pp. 448, 449, 455, 457 [16 L.Ed. 2d at pp. 708, 709, 712-714]) and its requirements of warning become operative only when the suspect is subjected to "custodial interrogation."[11] (*Id*. at pp. 444, 478 [16 L.Ed.2d at pp. 706, 726].) Thus when he is taken into actual or constructive custody for the purpose of questioning prior to or after being charged with a crime, the police are required to admonish him in accordance with the guidelines set forth in that decision. Following *Miranda* (384 U.S. at p. 444, fn. 4 [16 L.Ed.2d at p. 706]), some California cases have determined that a suspect is considered to have been taken into

[11]For a compilation of cases which have construed the phrase "custodial interrogation," see Note (1970) 31 A.L.R.3d 565.

custody at least when suspicion focuses on him to the degree that there is reasonable cause for his arrest (see, e.g., *People* v. *Manis* (1969) 268 Cal.App.2d 653, 667 [74 Cal.Rptr. 423]) and known police officers thereafter engage him in questioning. At that point in time, it is reasoned, the suspect may be led reasonably to believe that he is being deprived of his freedom of action in a significant way. (See *Miranda* v. *Arizona, supra,* 384 U.S. 436, 444 [16 L.Ed.2d 694, 706]; *People* v. *Arnold* (1967) 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515].)

■ Although suspicion had focused on defendant at the time of the recordations in the instant case he was not deprived of his freedom of action in any significant way. His statements were voluntary and he was entirely free to refuse to engage the Carnes brothers in a conversation about the crime. (See *Doty* v. *United States* (10th Cir. 1969) 416 F.2d 887, 894 (on rehg.); *Hurst* v. *United States* (5th Cir. 1967) 370 F.2d 161, 165; *United States* v. *Beno* (2d Cir. 1964) 333 F.2d 669, 671; *Todisco* v. *United States* (9th Cir. 1961) 298 F.2d 208, 210.) The setting in which this case arises simply does not involve the "custodial interrogation" with which *Miranda* is concerned.

■ We additionally reject defendant's contention that according to *Massiah* his Sixth Amendment rights were violated. Defendant appears to make the same argument that was made in *Hoffa* v. *United States, supra,* 385 U.S. 293, namely, that because the People had sufficient grounds to arrest him—at which point they were required to observe his Sixth Amendment rights—they should not have been allowed to obtain incriminating statements prior to such arrest without observance of his right to counsel. We note and agree with the observation of the majority in *Hoffa* that the principles expressed in *Massiah* do not apply in a pre-indictment setting. (*Hoffa* v. *United States, supra,* 385 U.S. at pp. 309-310 [17 L.Ed.2d at pp. 386-387]; see also *Wallace* v. *United States* (1969) 412 F.2d 1097, 1101 [134 App.D.C. 50]; *Hurst* v. *United States* (5th Cir. 1967) 370 F.2d 161, 165; *Rogers* v. *United States* (10th Cir. 1966) 369 F.2d 944, 947; *People* v. *Mabry* (1969) 71 Cal.2d 430, 441 [78 Cal.Rptr. 655, 455 P.2d 759]; *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 170 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416].) In sum, we hold that the procedures employed in obtaining the recorded conversations in this case withstand constitutional scrutiny.

*Admissibility of the Photographs of the Victim*

Defendant complains that the photographs of his deceased wife were

erroneously and prejudicially received in evidence.[12] He argues that because of the gruesome and bloody nature of the photographs the only purpose they could have served was to inflame the minds of the jurors. The admission of such photographs, of course, lies solely within the discretion of the trial judge (*People* v. *Robles* (1970) 2 Cal.3d 205, 214 [85 Cal.Rptr. 166, 466 P.2d 710]; *People* v. *Sanchez* (1967) 65 Cal.2d 814, 828 [56 Cal.Rptr. 648, 423 P.2d 800]) and his ruling will not be reversed unless their probative value is clearly outweighed by their prejudicial effect (see, e.g., *People* v. *Love* (1960) 53 Cal.2d 843, 854-858 [3 Cal.Rptr. 665, 350 P.2d 705]).

The People initially point out that trial counsel made no objection when the prosecution sought to have the photographs admitted and that the trial judge, therefore, was not afforded the opportunity to exercise his discretion in determining whether the photographs should have been excluded. (See Evid. Code, § 352.) The People apparently take the position, and properly so, that defendant cannot now be heard to complain because of his failure to object. Defendant agrees that such objections should have been made but that the failure to do so merely illustrates one of the ways in which he was deprived of an adequate defense, an issue which is hereinafter discussed. Although we are of the view that the error, if any, in receiving the photographs was not prejudicial (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]), we nevertheless deal with the issue on the merits.

Defendant relies on *People* v. *Love, supra,* 53 Cal.2d 843 in support of the claimed error in receiving the photographs. The defendant in *Love* was charged with the shotgun murder of his wife. On the issue of penalty the trial court admitted in evidence a photograph showing a front view of the deceased wife lying on a hospital table and a tape recording taken in the hospital emergency room shortly before she died. The photograph did not show her wound, but did show an expression of pain on her face in death. The sole purpose of playing the recording was to let the jury hear the failing voice and the groans of the deceased while she was dying. The playing of the recording was preceded by the testimony of a doctor that she was in extreme pain, that the blast had severely injured one of her kidneys, and that the pain caused by the passage of blood clots from the kidney into the bladder was probably one of the most painful conditions to which one could be subjected. The prosecution did not suggest that the defendant intended to cause such pain, but it appears that the

[12]The only objection defendant made at trial regarding the admission of these photographs was that in referring to them as exhibits and how they were to be numbered, there should be no mention of the case of Warren O. Saling.

photograph and tape were introduced in evidence for the purpose of apprising the jury of the pain suffered by the deceased. On appeal the People argued that the photographs were admissible to demonstrate the enormity of the crime that defendant had committed. We held that the receipt of the photograph and tape recording was reversible error, stating, "[p]roof of such pain is of questionable importance to the selection of penalty unless it was intentionally inflicted. . . . [and] even if relevant and material, Mrs. Love's pain was more than adequately described by the doctor." (*Id.* at pp. 856-857.)

It should be noted, however, that this court also held two 8- by 10-inch color photographs of the wife's nude body on a hospital table had been properly admitted. The photographs showed a hole about 4 inches in diameter in her back and a large amount of blood on her back, the table, and the hands of the person holding her body. We stated that although the photographic evidence was largely cumulative and might properly have been excluded, the trial court did not abuse its discretion in receiving it.

Here, the photographs of which defendant primarily complains are as follows: (1) A 5- by 7-inch black and white front view of the victim lying on a table. Her eyes are about half open and she is expressionless. She is clad in a blood-stained dress and there is dried blood covering most of her face and neck region. There are a few blood stains on her arms and legs. A knife hole in the dress is visible in the area of a stomach. (2) A 5- by 7-inch black and white back view of the victim lying on the same table. She is nude and two circled stab wounds are visible in the lower back region. No blood stains are visible. (3) An 8- by 8-inch color photograph of the decedent lying on her back on the ground where she was found by investigating officers. The photograph shows the portion of her body above her legs. Her eyes are partially open and she is expressionless. She is clad in a blood-stained dress the bottom of which has been pulled up to expose two stab wounds in her stomach area. There is dried blood covering most of her face and neck region. There are blood stains on her arms. A stab wound is visible in her neck.

Defendant argues that the only conceivable basis for admitting the photographs would have been to illustrate the number and location of his wife's wounds, but since they were adequately described by the autopsy surgeon, receipt of the photographs was not necessary. ▆ The photographs in this case did much more than merely indicate the number and location of Catherine Murphy's wounds. One of the arguments made to the jury by the prosecution was that the murder was "rather bizarre" and that it was "no ordinary robbery which resulted from picking up someone

who appeared to be out of gas," as one would be led to believe by defendant's story. In support of this theory, during closing argument, the prosecutor argued that "this killing was an execution," "whoever killed her was doing a job on her," and "so the facts of the case, the nature of the killing, right away tell you there is something wrong with the way that this woman [was] killed." Thus the photographs were relevant on the issues of malice (*People* v. *Brawley* (1969) 1 Cal.3d 277, 295 [82 Cal.Rptr. 161, 461 P.2d 361]; *People* v. *Sanchez, supra,* 65 Cal.2d 814, 828; *People* v. *Harrison* (1963) 59 Cal.2d 622, 627-628 [30 Cal.Rptr. 841, 381 P.2d 665]) and aggravation of the crime and the penalty (*People* v. *Brawley, supra,* 1 Cal.3d 277, 295; *People* v. *Stanworth* (1969) 71 Cal.2d 820, 839 [80 Cal.Rptr. 49, 457 P.2d 889]). They also tended to clarify the testimony of the autopsy surgeon regarding the precise location of the wounds (*People* v. *Robles, supra,* 2 Cal.3d 205, 214; *People* v. *Brawley, supra,* 1 Cal.3d 277, 295; *People* v. *Gardner* (1969) 71 Cal.2d 843, 852 [79 Cal.Rptr. 743, 457 P.2d 575]).

In addition to other grounds justifying the receipt of the photographs they tend to discredit extrajudicial statements made by defendant. Shortly after the homicide defendant told one of the investigating officers that when he regained consciousness he went to his wife and they said prayers together. The photographs of the victim's condition tended to refute defendant's statement to the officer. (See *People* v. *Tolbert* (1969) 70 Cal.2d 790, 806 [76 Cal.Rptr. 445, 452 P.2d 661]; *People* v. *Mathis* (1965) 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65].)

Although the photographs in this case might be characterized as bloody and gruesome they were relevant to the issues and unlike those in prior cases the admission of which necessitated reversal. (See *People* v. *Cavanaugh* (1955) 44 Cal.2d 252, 267-268 [282 P.2d 53].) The trial court did not abuse its discretion in receiving the exhibits.

### Alleged Error in Failing to Present Additional Defense Evidence

The evidence presented by the People on the issue of defendant's guilt may be characterized as overwhelming. The defense, however, presented only two witnesses during the guilt phase of the trial and three witnesses during the penalty phase. Defendant argues that if defense counsel's strategy was to present a "minimal defense," which he urges constituted "no defense at all," to gain the sympathy of the jury it was tantamount to a plea of guilty. As such, he contends, the trial judge was required to obtain from him an explicit waiver of his rights in accordance with *In re Tahl* (1969)

1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].[13] If that was not his strategy, he continues, the absence of an effective defense brings this case within the ambit of *People* v. *Ibarra* (1963) 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487], in which case reversal would also be required. These arguments are untenable.

The rationale of *Tahl* and its offspring is to "assure that the record demonstrably discloses the defendant knows of and voluntarily waives the three specified rights [against self-incrimination, to a jury trial, and to confront adverse witnesses] surrendered by a guilty plea." (*In re Sutherland* (1972) 6 Cal.3d 666, 671 [100 Cal.Rptr. 129, 493 P.2d 857]; see *People* v. *Gallegos* (1971) 4 Cal.3d 242, 247 [93 Cal.Rptr. 229, 481 P.2d 237].) The mandate of *Tahl*, however, applies only to pleas of guilty and situations tantamount to a plea of guilty. (See, e.g., *In re Mosley* (1970) 1 Cal.3d 913, 924-925 [83 Cal.Rptr. 809, 464 P.2d 473] (submission of the case on the transcript of the preliminary hearing which contained primarily incriminating evidence).) Nothing in our decisions following *Tahl* indicates that the principles expressed therein were intended to apply to jury trials, even where the evidence of guilt is overwhelming. When a defendant undergoes a jury trial any competent defense counsel will inform him of his right to call witnesses on his own behalf, of his right to testify or not to testify, and, in the absence of unusual circumstances, will cross-examine the witnesses for the prosecution. Here, defendant's case was tried to a jury. Through counsel he clearly exercised his right of confrontation by cross-examining prosecution witnesses and he took advantage of his right against self-incrimination by not taking the witness stand.

Defendant also contends that because of the compelling evidence of his guilt and because defense counsel failed to present additional evidence of his innocence, having the practical effect of a plea of guilty, the trial court was required to secure his waiver of the right to offer evidence beyond that which had already been presented. ■ Although there are certain fundamental rights which must be expressly waived in words by the defendant in open court (see, e.g., *In re Tahl, supra,* 1 Cal.3d 122 (right to jury trial)), the right to present additional evidence during trial is not one of them. The presentation of a particular quantum of evidence may not be characterized as a right; rather it is an event which rests on a tactical decision to be made by counsel. Thus, irrespective of the quantum or quality of evidence of a defendant's guilt, the failure to present additional evidence

---

[13]Defendant relies on wording in *People* v. *Gallegos* (Cal.App.) 89 Cal.Rptr. 503. We granted a hearing in that case on November 10, 1970, and the opinion of the Court of Appeal, therefore, became a nullity. (*Knouse* v. *Nimocks* (1937) 8 Cal.2d 482, 483-484 [66 P.2d 438].)

on the issue of his innocence does not involve a question of waiver but the issue of adequate representation of counsel (see, e.g., *People* v. *Mosqueda* (1970) 1 Cal.App.3d 540, 545 [85 Cal.Rptr. 346] (involving defense counsel's decision not to present testimony by the defendant)).

█ It appears in the instant case that defendant's attorney presented whatever evidence he thought was appropriate under the circumstances.[14] In the course of our review of the lengthy record we found no grounds for objections by defendant to either the manner in which his attorney was conducting the case or the decision not to proffer additional evidence at trial if indeed any such evidence was available.[15] That the evidence so presented could be described as "minimal" was not the result of defense counsel's incompetence as suggested by defendant; it was the concomitant of being faced with compelling evidence of defendant's guilt and, perhaps the possibility that any additional evidence would serve to further weaken the defendant's case. The record clearly indicates that the decision not to present additional evidence was tactical.[16]

### Alleged Error in Excluding Jurors Unwilling to Impose the Death Penalty

Defendant finally contends that the exclusion during the guilt trial of

[14]The testimony of Mrs. Saccomando, if believed by the jury, would tend to show that defendant was concerned with his wife's safety and well-being and would tend to negate one of the prosecution's suggested motives for the killing—an extramarital affair. The testimony of the insurance agent, if believed, would tend to minimize the People's second suggested motive for the murder—proceeds from the insurance policies on his wife's life. In addition, although defendant did not testify, the story he initially related to investigating officers was before the jury. That story, taken together with the defense testimony, presented a possible basis for a conviction for a lesser offense or for acquittal.

[15]The record does not contain the slightest intimation that defendant was physically or mentally unable to make such objections. From a reading of the transcripts of the recordings of the conversations with Jerry and Richard Carnes, in which he advises them what to do if they should be bothered by the police, he purports to be well informed of his rights.

[16]"[DEFENSE COUNSEL]: In this matter, your Honor, I've had a discussion with Mr. Murphy, and it is our intention at this time to rest the defense in this matter.

"I have discussed it with Mr. Murphy. We have discussed the pros and cons of it.

"I told him the final decision was his. And I told him as his attorney, and for various reasons which I did discuss with him, which I do not wish to discuss on the record at this time, that it is my opinion that he should not take the stand in this matter.

"I told him it would be beneficial to him on both the guilt or innocence stage, and also the penalty stage, if it goes that far.

"And I have indicated, by the way, to preserve the record, I did indicate to Mr. Murphy that chances are that it would go that far.

". . . . . . . . . . . . . . . .

"THE COURT: The Court takes it, then, that the defense rests at this time?

"[DEFENSE COUNSEL]: That is correct, your Honor."

four jurors who were unwilling to impose the death penalty made the jury "guilt prone."[17] He requests an evidentiary hearing to develop the argument that "empirical evidence is now available [citing Jurow, *New Data on the Effect of a 'Death Qualified' Jury on the Guilt Determination Process* (1971) 84 Harv.L.Rev. 567] indicating that a jury from which persons who would never vote to impose the death penalty are excluded is a 'hanging jury' with regard to determination of guilt [i.e., more likely to convict]." Similar requests were made in *People* v. *Sirhan* (1972) 7 Cal.3d 710, 747-749 [102 Cal.Rptr. 385, 497 P.2d 1121], *People* v. *Robles, supra,* 2 Cal.3d 205, 219, *In re Arguello* (1969) 71 Cal.2d 13, 16 [76 Cal.Rptr. 633, 452 P.2d 921], and *In re Anderson* (1968) 69 Cal.2d 613, 620-621 [73 Cal.Rptr. 21, 447 P.2d 117], and were rejected for various reasons. ▮ We must again reject the contention not only because of our decision in *People* v. *Anderson, supra,* 6 Cal.3d 628 but because we are not willing to accept as decisive the conclusion of the Jurow study that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. Defendant simply fails to establish the validity of such a claim.[18]

The judgment, insofar as it provides for the penalty of death, is modified to provide a punishment of life imprisonment and as so modified is affirmed in all other respects. *(People* v. *Anderson, supra,* 6 Cal.3d 628.)

Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I concur in the majority opinion, except that, for the reasons expressed in my dissenting opinion in *People* v. *Anderson,* 6 Cal.3d 628, 657 [100 Cal.Rptr. 152, 493 P.2d 880], I dissent from the modification of the judgment.

Appellant's petition for a rehearing was denied December 29, 1972.

---

[17]For obvious reasons we need not deal with the issue whether the jurors were properly excluded under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

[18]Defendant presents an additional contention which is frivolous. He insists that the trial court should have obtained his waiver to present additional evidence in the form of an affidavit of one of his daughters to establish his innocence. The trial commenced on June 3, 1970, and ended July 13, 1970. The affidavit was executed on February 19, 1971, in Dublin, Ireland. There is no indication that either the trial judge, or defendant or counsel knew of an affidavit by defendant's daughter which would be executed eight months after trial commenced. For that reason counsel's motion to augment the record to include, among other things, the affidavit was denied.