Filed 4/21/14  P. v. Thibodeaux CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KENNETH JEROME THIBODEAUX,<br><br>Defendant and Appellant. | B246364<br>(Los Angeles County<br>Super. Ct. No. KA0098244)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on March 20, 2014, be modified as follows:

1.  On page 15, the first paragraph, third full sentence, the word "initially" is inserted between the words "court" and "bypassed."

2.  On page 15, the first paragraph, at the end of the fourth full sentence, add as footnote 7 the following footnote, which will require renumbering of all subsequent footnotes:

**7** The parties stipulated that Calandra acted "under the direction of" the LASD when she recorded her cell phone conversation with appellant.  After ruling on the basis of the Fourth Amendment, the trial court also found the recording admissible because Calandra acted as an agent of law enforcement.  We agree with, but need not address appellant's argument regarding the propriety of, that ruling.  The recording was admissible on the alternative ground articulated by the trial court.  We affirm the trial court's rulings, not its reasoning and will affirm on any theory properly established by the

record.  (*People v. Mason* (1991) 52 Cal.3d 909, 944; *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18–19.)

3.  On page 15, the last two sentences of the first paragraph are deleted.

4.  On page 15, the second full paragraph beginning with "[I]n 1982," and ending with "at p. 227.)" is deleted and the following paragraph is inserted in its place:

"[I]n 1982, the California voters passed Proposition 8.  Proposition 8 enacted article I, section 28 of the California Constitution, which provides in relevant part:  'Right to Truth-in-Evidence.  Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial . . . motions and hearings . . . .' (Cal. Const., art. I, § 28, subd. (f), par. (2).)"  (*People v. Lazlo* (2012) 206 Cal.App.4th 1063, 1069.)  The "Truth-in-Evidence" provision in subdivision (f), paragraph (2), of article I, section 28 of the California Constitution "was intended to permit exclusion of relevant, but unlawfully obtained evidence, only if exclusion is required by the United States Constitution . . . ."  (*In re Lance W.* (1985) 37 Cal.3d 873, 890 (*Lance W.*).)  Section 28, subdivision (f), paragraph (2) applies both to judicially created rules of exclusion (*In re Demetrius A.* (1989) 208 Cal.App.3d 1245, 1247), and to statutory evidentiary restrictions.  (See *Lance W.*, at pp. 893–896.)

5.  The six paragraphs which commence on page 15 with "In *Algire, supra,*" and which end at the bottom of page 17 with the sentence ending with "(*Lance W.*, *supra*, 37 Cal.3d at p. 896.)," including footnotes appended thereto, are deleted and the following paragraph is inserted in their place:

In 1985, the Legislature enacted the Cordless and Cellular Radio Telephone Privacy Act of 1985 (the 1985 Act), which, with certain exceptions, prohibits the interception of cell phone communications.  (Stats. 1985, ch. 909, § 2, p. 2900.)  The 1985 Act amended section 632 and related statutes, adding section 632.5, without substantially changing the language of section 632, subdivision (d).  At least two-thirds of the members of each house of the Legislature voted in favor of the 1985 Act.  (See tallies, Sen. Bill No. 1431, Final History (1985–1986 Reg. Sess.) p. 965.)  Based on the

principles articulated in *Lance W.*, *supra*, 37 Cal.3d 873, we ascertain no legislative intent, in amending the Invasion of Privacy Act, to resuscitate the abrogated exclusionary rule of section 632, subdivision (d). The 1985 Act reflects the Legislature's intent to focus on the need to protect private cell phone communications. (Stats.1985, ch. 909, § 2, pp. 2900–2901 ["[T]his act is intended to provide recourse to those persons whose private cellular radio telephone communications have been maliciously invaded by persons not intended to receive such communications"].) No provision in the 1985 Act itself, nor any legislative history identified by appellant, reflects a Legislative intent to nullify the exclusionary rule of 632, subdivision (d). Accordingly, the trial court was correct: an audio recording of a cell phone call between the victim and defendant is excludable only under the federal rule applicable to evidence seized in violation of the Fourth Amendment. (*Lance W.*, *supra*, 37 Cal.3d at p. 896.)

6. At the end of the newly inserted paragraph identified in Item No. 5 above, add as footnote 8 the following footnote:

[8]Of course, if the victim did not record the conversation while acting as a government agent, defendant's Fourth Amendment interests are not implicated. (See *Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 333; *Zhou v. Pittsburg State University* (D.Kan. 2003) 252 F.Supp.2d 1194, 1203–1204 [under 18 U.S.C. § 2511(2)(d), recordings of conversation between private individuals made with consent of one party to conversation is admissible].)

There is no change in the judgment.

The petition for rehearing is denied.

NOT TO BE PUBLISHED.


ROTHSCHILD, Acting P. J.          JOHNSON, J.          MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 3/20/14  P. v. Thibodeaux CA2/1 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KENNETH JEROME THIBODEAUX,<br><br>    Defendant and Appellant. | B246364<br><br>(Los Angeles County<br>Super. Ct. No. KA0098244) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Wade Olson, Commissioner.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, and Yun K. Lee, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Appellant Kenneth Thibodeaux challenges his conviction for continuous sexual abuse. He contends that the trial court's admission of a surreptitiously recorded conversation between himself and the victim's mother contravened Penal Code section 632, subdivision (d), and was a violation of his Fourth Amendment right of privacy, and his Fifth and Sixth Amendment right to counsel. We affirm.

## PROCEDURAL BACKGROUND

Appellant was charged by information with aggravated sexual assault of a child (count 1; Pen. Code, § 269, subd. (a)(1)),[1] forcible child molestation (count 2; § 288, subd. (b)(1)), continuous sexual abuse (count 3; § 288.5, subd. (a)), and rape (count 4; § 261, subd. (a)(2)). Appellant pleaded not guilty.

Before trial, appellant moved to suppress a recording of a cell phone call conversation between himself and his estranged wife, the victim's mother, C. Thibodeaux (C.), which C. made under the direction of Detective Alfonso Lopez, of the Los Angeles County Sheriff's Department (LASD). Appellant's counsel argued that the conversation was recorded in violation of sections 629.72, 631, 632 and 182, as it was "a confidential communication recorded without the knowledge or the consent of defendant." Counsel also argued that the recording violated appellant's Fourth Amendment right to privacy. At the hearing on the motion, appellant's counsel also argued that the recording violated appellant's right to counsel and his right against self-incrimination.

The parties stipulated that, following appellant's arrest in January 2012, he exercised his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (*Miranda*), and was released, and that the phone call was recorded at the detective's request after appellant had been released. The prosecution asserted that (1) disclosure of the recording was permissible, and use of the recording was permitted for law enforcement; (2) the term "victim," encompassed the victim's mother; and (3) that the Invasion of Privacy Act (§ 630 et seq.) was not preempted by federal law

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

because California law is more restrictive than federal law.  The prosecutor argued that, although the "law enforcement exception" and "victim of the crime exception" were independent of one another, both applied and C. had acted as the LASD's agent. Appellant's counsel disagreed that "victim" included the victim's mother.  The parties stipulated that C. recorded the call from appellant "under the direction" of the detective, and at a time when no case was pending against appellant, but after his initial arrest and exercise of his *Miranda* rights.

During the portion of the hearing directed to the Invasion of Privacy Act, the trial court itself raised, and the parties argued, whether the issue was governed by Fourth Amendment search and seizure law, section 632 having been abrogated by the passage in 1982 of Proposition 8.[2]  The court noted that Proposition 8 "federalized" California's search and seizure law such that exclusion of unlawfully obtained evidence was required only if required by the United States Constitution.  At the conclusion of the hearing the trial court found no Fourth, Fifth or Sixth Amendment violations, and denied the motion to suppress.

A jury deadlocked as to counts one, two and four, and the court declared a mistrial.  Appellant was found guilty as to count 3.

Appellant was sentenced to 16 years in state prison, ordered to pay various fees and fines, and awarded 162 presentence custody credits.  The remaining counts were dismissed due to plea negotiation.  This timely appeal followed.

**FACTUAL BACKGROUND**

---

[2] "[I]n 1982, the California voters passed Proposition 8.  Proposition 8 enacted article 1, section 28 of the California Constitution, which provides in relevant part: 'Right to Truth–in–Evidence.  Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings. . . .'  (Cal. Const., art. I, § 28, subd. (f), par. (2).)"  (*People v. Lazlo* (2012) 206 Cal.App.4th 1063, 1069.)  Previously, the "Right to Truth–in–Evidence" provision enacted by Proposition 8 was found in subdivision (d) of article I, section 28 of the California Constitution.

3

*Prosecution evidence*

The victim, born in September 1994, who was 18 years old at the time of trial, was three when she met appellant. Appellant married the victim's mother, C., in 2001. C. and appellant had a son, R.. The victim lived with her mother, R., and appellant. Appellant had two daughters from a previous marriage, Caitlyn and Kaylee, who were a few years older than the victim. They visited their father often, and slept in the living room or den when they stayed at the house. C. left for work at about 6:45 a.m., leaving the victim home alone with appellant who drove her to and from school.

The victim called appellant "dad," and had a good relationship with him until she was about eight years old. Once, as the victim fed her turtle in her bedroom after school, appellant came into her room wearing only shorts, pulled down his shorts and exposed his erect penis. He then walked out after pulling up his shorts. Later, appellant apologized for his behavior. He told the victim not to say anything because her mother would be upset with her, and promised not to do it again.

One night in 2004, when the victim was about 10 years old, C. saw appellant get out of bed at about 11:00 p.m., and thought he was going to the bathroom. When he didn't return right away C. went looking for him. She found him in the living room where the victim and Kaylee were asleep in front of the T.V. The victim was wearing underpants, and her nightgown was raised to her chest. C. saw appellant crawling slowly toward the sleeping girls with a hand in his pants. When C. asked him "[w]hat [he was] doing?," appellant pulled his hand out and said, "I don't like what you're accusing me of." He explained that he wanted to watch something on television; appellant had a television in his bedroom. The next day, C. took the victim to a hospital for a sexual abuse examination.

After that exam, C. had the victim and R. sleep with her for a few days with the door locked. A social worker investigated the incident. Appellant seemed nervous and told the victim not to say anything or it would break the family apart, upset her mother and she and R. would be sent to foster care. When interviewed, the victim did not tell the social worker anything about the prior indecent exposure incident. C. drove the victim to

4

school for the next two years.  After that, the victim changed schools and appellant resumed taking her to school and picking her up.

One morning, between January and May 2007, when the victim was 12 years old, she was lying in bed before school.  Appellant came into her bedroom in his underwear, lay down behind the victim and put his arm around her; she felt something hard.  The victim turned around and appellant got on top of her and pulled off his underwear and hers while holding her hands above her head.  The victim tried to push him off.  Appellant opened the victim's legs with his hands and inserted his penis into her vagina.  When appellant stopped, the victim saw that blood was smeared between her legs.  Appellant told her to clean up and to get ready for school.  The victim did not tell anyone what happened because she felt confused and betrayed.  Around this time, appellant had sex with the victim four or five times.  The sex took place in the victim's room when C. was not home.  Sometimes the victim tried to get away.  The victim yelled at and scratched appellant, who laughed and said she was "playing hard to get."  C. noticed the scratches; appellant said they came from yard work.

Between January 2008 and late September 2008, when the victim was 13 years old, appellant had sex with her every morning before taking her to school.  He would lie next to her, get on top of her quickly and inserted his penis into her vagina.  Sometimes the victim was able to run away, and other times he caught her and brought her back to her bedroom.  Sometimes appellant held the victim's hands over her head.  Sex was always on the victim's bed or on the floor.  A few times the victim scratched appellant on his stomach or chest.  Appellant ejaculated on the victim's stomach or leg.  He washed her blankets and curtains.  C. asked appellant about the scratches; he claimed to have gotten them working in the yard.

Appellant continued to have sex every morning with the victim after she turned 14 years old in 2008.  The victim did not tell anyone because she did not think anyone would believe her and she was afraid her family would be broken up.

One morning, in 2009 when the victim was 15 years old, C. left for work in the morning but returned home about 30 minutes later because the traffic was bad.  As she

quietly entered the house, C. saw appellant coming out of the victim's room in his underwear. He looked startled and his penis was erect. C. yelled at appellant and confronted him. Appellant said, "[I]t's not what you think." Inside the room C. found the victim on her bed in her pajamas, curled in the fetal position. When C. asked her daughter what appellant had been doing in her room, the victim said she did not know.

C. took the victim to school, and asked her what had been going on. The victim cried but did not tell her mother anything. After that morning, appellant stopped coming into the victim's room in the morning. C. did not recall having any further conversations with appellant about the incident, and took no action. The victim stopped speaking to appellant after that incident.

The victim graduated from high school in 2011. In the two years leading up to the victim's graduation, the victim described appellant as "paranoid." He called her, looked through her journals and phone, and followed her. Appellant allowed the victim no privacy, and she and he argued frequently.

On November 11, 2011, the victim told her mother she did not want appellant to attend her graduation. When asked why, the victim said that appellant had been sexually abusing her since she was eight years old. The victim also told appellant's daughters. While appellant was out, C. packed his belongings and, when he returned, she accused him of raping the victim. Appellant denied "everything" and left the house. The next day, C. took the victim to the police station to report the sexual abuse.

On November 21, 2011, the victim and C. spoke with Detective Lopez. Detective Lopez is assigned to the Special Victim's Bureau of the LASD Child Abuse Unit, and is specially trained to investigate child sexual abuse cases. The victim was unclear about the dates on which the incidents of abuse occurred. She told Detective Lopez that appellant had started having sex with her when she was 13 years old in 2008, and stopped in 2009. The victim began having sex in 2007 when she started to have boyfriends. The victim did not tell Detective Lopez that appellant had raped her three to four times when she was 12 years old, did not mention that he had held her hands over her head, opened her legs with his hands, chased her or that she tried to fight him off. The victim told

6

Detective Lopez appellant had exposed himself to her, but never mentioned the incident when she was feeding her turtle. She also told him that she had almost told her mom about appellant when C. found appellant coming out of her room but "couldn't bring herself to do it." C. told Detective Lopez she had returned home that morning because she had suspicions about appellant and the victim. C. did not mention to Detective Lopez that appellant had an erection as he left the victim's room.

A few weeks after their initial interview, Detective Lopez asked C. to record a "pretext" call between herself and appellant or appellant and the victim.[3] C. and the victim made several unsuccessful attempts to reach appellant from Detective Lopez's office. In January 2012, the district attorney's office rejected the case for insufficient evidence. No charges were filed and appellant was released from custody. Detective Lopez instructed C. to try again to record a pretext call. In February 2012, C. filed for divorce.

In May 2012, appellant called C. from his cell phone. C. recorded the conversation and gave the recording to Detective Lopez. The jury heard excerpts of that conversation.

In the call, appellant tells C. he needs to "protect himself" and hopes their conversation will "remain between you and I and nobody else." He says he still loves C., hopes they can still have a future together and apologizes for "everything and any pain" he has caused. C. asks appellant to explain why he and the victim "continue[d] that for so long." Appellant acknowledges that C. deserves answers but says he is afraid that Detective Lopez will be "knocking on [his] door," and asks C. to give him her word their conversation will remain between them; she does. He tells her that the victim came to him lonely and seeking affection. She wanted appellant to cuddle with her in the mornings. Their relationship began with hugging, but then "one day we did that."

---

[3] A pretext call is a recorded conversation between the suspect and another individual commonly used as an investigative technique to gather evidence against the suspect.

7

Appellant says the victim was practically naked, wearing a thong and was "like you know you like it." Appellant tells C. the relationship with the victim lasted about six months and that he had never forced himself on her. He says it was not a one-way street, but does not want to blame the victim. When C. observed that appellant was supposed to resist, he replied, "I failed," and acknowledged that he was "a weak man." C. tells appellant it is sad that he ruined his life and family "over a piece of fucking pussy." Appellant replies, "Yea it's pretty sad and . . . I feel horrible about it."

*Defense evidence*

LASD Deputy Erick Escobar interviewed the victim and C. on November 12, 2011. The victim told Escobar she was 12 years old when she was first raped by appellant. He raped her three or four times during the next six months. After she turned 13, he raped her every morning. Appellant stopped raping the victim after she started high school. The victim's school records show that she earned A's and B's between 2006 and 2009, and was ranked seventh out of 322 students at her junior high. In 2006 and 2007, the victim was involved in two conflicts with another student, and received detentions. She had five tardies during the 2006 school year, one in 2007, and four in 2008.

A senior LASD criminologist examined the victim's bedroom in January 2012 for potential evidence of sexual assault, particularly semen. None was found. According to the criminologist, temperature changes, the passage of time, and laundering of sheets, rugs or carpet tend to degrade or decrease the chance of finding biological materials. C. told the criminologist the carpet had been shampooed in November 2011.

Phillip Lopez, who was about a year older than the victim, was her boyfriend from the time she was in fourth grade until she was in ninth grade. The victim had told him she felt close to appellant (her "father"), that she loved him and that she and he talked a lot about everything. The victim never said anything negative about appellant, never said he had sexually abused or raped her, and never gave Philip and reason to believe she was having problems at home.

8

Serita Moore is appellant's mother. Moore never saw appellant treat the victim any differently than any of the other children. Sometime before November 2011, appellant told Moore that the victim was angry at and not speaking to him, but he did not know why. In early November 2011, C. told Moore that the victim had said appellant molested her twice, when she was nine and 11 years old. When Moore asked C. if she believed her daughter's accusation, C. said, "Well, if I believe Ken, I'm gonna lose [the victim]. And I will not lose my daughter."

Appellant's youngest daughter Kaylee, from his first marriage to Cassandra Thibodeaux, was 19 at the time of trial. Kaylee was six years old when her parents divorced. She saw her father about four times per week thereafter, spent most weekends with appellant and lived with his family for two months in 2008 when she was in middle school. Nothing sexual ever occurred between Kaylee and appellant, and appellant was never aggressive with Kaylee, her sister Caitlyn, or the victim. Kaylee and the victim were like sisters and "talked about anything." In the mornings, appellant dropped the victim off at her grandmother's or a friend's house before taking Kaylee to school. Appellant's family had a turtle in the den, but not in the victim's room. Between 2009 and 2011, the victim did not appear intimidated by appellant, or withdrawn or reclusive. Once when Kaylee and the victim were teenagers, the victim told Kaylee that she was trying to get appellant out because she wanted her mother to be with someone who "has money and that drives a Mercedes Benz," not a construction worker like appellant.

Appellant's eldest daughter, Caitlyn, was 21 at the time of trial. She described appellant as a loving but strict father. As a child, Caitlyn visited appellant's home "all the time," and had visited frequently between 2007 and 2009 when everything seemed fine. The victim had written a poem and made a plaque for appellant for Father's Day in 2008, and attended Caitlyn's graduation in 2009 at which the family took photos together, and looked happy. The victim and appellant made a photo collage for Caitlyn's 18 birthday. There was no lengthy period during which the victim and appellant did not communicate. Caitlyn and the victim were close until recently. Caitlyn described the victim as a person who was not intimidated, and who "gets what she wants." In 2008 or

9

2009, the victim had said her mother needed someone with money and who drove a Benz, not someone who came home with paint on his hands. She said she wanted to "plot to get rid of [appellant]." When Caitlyn said they were "all happy," the victim responded that, "[We] could all be happy without him." In November 2011, the victim told Caitlyn that appellant had molested her.

Anthony Collins is appellant's stepbrother. The two have a close relationship, although they drifted apart and had no contact from late December 2006 until early 2010. Appellant had a loving and close relationship with his children, with whom he was very close. He treated the victim the same as his other daughters. The victim was sometimes disrespectful and "talked back" when appellant criticized her clothes. In October 2011, appellant called Collins. He was upset, and said that the victim did not want C. to be married to him anymore. Collins overheard the victim tell her mother she needed to find someone rich. Appellant lived with Collins' family from November 2011 until June 2012. Collins has a daughter, but was not concerned about appellant being around her.

Pamyla Burris is appellant's sister, and they are very close. The victim has always been "very strong willed, very mouthy, sassy." After she became a teenager, the victim got "more direct, more bossy, manipulative." Appellant disciplined all his children, including the victim. Burris has seen appellant discipline the victim for wearing inappropriate clothing and for not listening to adults at dinner. Burris would not believe a recording that C. produced because she and the victim are angry with appellant and want to get rid of him.

Cassandra Thibodeaux was married to appellant for 12 years before they divorced. The divorce was amicable and they remain friends. Appellant was a caring husband, a "good dad" and never engaged in any inappropriate acts towards their daughters. After appellant married C., he was devoted to her and their family, although he was "henpecked" and C. was difficult. Between 2007 and 2009, the victim frequently spent the night at Cassandra's house. She spoke highly of appellant and seemed happy, although there was occasional conflict between the victim and Cassandra's daughters. In

10

2010, the victim started saying she wanted appellant to make more money and wanted C. to be with someone who drove a Lexus or a Mercedes.

Appellant testified that he never had sexual intercourse with the victim. In 2003, appellant's family had a pet turtle, but it was kept in the den, not the victim's room. When the victim was in eighth grade, appellant took care of the household and dropped the victim at her grandmother's house (which was near the victim's school) in the morning before he went to work.

The relationship between appellant and the victim changed in 2009, when the victim was in the ninth grade. At that time, the victim felt unloved by her family and came to him for hugs. Appellant told C. to read the victim's diary because he felt she was not showing the victim enough affection; C. refused. The victim required frequent discipline for lying, inappropriate behavior with boys, wearing inappropriate clothing and being disrespectful. Disciplining the victim was a major source of conflict between appellant and C. Once in early 2011, appellant found an empty liquor bottle. After he confronted her, the victim screamed and cursed at appellant and tried to hit him, hitting her mother instead. After appellant closed his bedroom door, the victim kicked a hole in it.

In July 2011, appellant and C. argued about buying the victim a car. The argument lasted several hours, after which the victim said appellant did not make enough money and her mother should find someone else and get rid of him.

Appellant thought he and C. had a "good" relationship, but she often believed appellant was cheating on her.

With regard to the incident in 2004, when the victim and Kaylee were asleep in the living room, appellant explained that he awoke about 11:00 p.m. after hearing the television. He had gone into the living room to check on the girls, and was kneeling down to retrieve the remote control, which was between the victim and Kaylee, to turn off the television when C. came up behind him and startled him. C. did not lock the victim, R., and herself in the bedroom for two days after that incident.

11

Appellant first learned about the victim's allegations of sexual abuse in early November 2011, when C. told him the victim did not want him to attend her graduation. The victim wanted to bring a young man to her graduation. Appellant did not approve of the young man (he was 21; the victim was 17), and told the victim she could not bring him. The victim became upset, they argued and the victim accused appellant of sexual abuse. Appellant moved out of the house a few days later to give C. space, and because she changed the locks.

Appellant was arrested in January 2012. He was released two days later, after which he and C. spoke often. They discussed the allegations, and appellant denied ever having sex with the victim. Appellant believed C. would come back to him, and they could rebuild their family if he told her "something." Portions of his conversation with C. are missing from the tape that was played for the jury. In the missing portion, C. told appellant that if he told her "something, then we can possibly work through this."

Appellant told C. that his relationship with the victim went on for "six months" because "that's about the time that [the victim] was coming to me and saying that she wanted—she just wanted hugs and she didn't feel loved." He said he wanted to tell C. the truth but did not want to lose his freedom because he was afraid his words might "get twisted." He told C. he understood if she never wanted to see him again because of everything that had happened during their marriage. Appellant denied that his relationship with the victim ever went beyond hugs. He told C. what she wanted to hear in order to restore their relationship. Appellant told C. about an incident when the victim came out of her room in a thong and he told her not to come out dressed like that. He had never told her about that before. When appellant told C. during the call that he had "failed," he was referring to their marriage. At the end of the conversation, appellant apologized to C. for being upset.

*Rebuttal*

The victim testified that, even after appellant raped her she made him a Father's Day plaque in middle school, because she "still wanted [her] family to be together." She smiled in photos taken at Caitlyn's graduation and other events because "everything was

12

a secret" and she did not want to "expose" herself. The victim did not say she wanted her mother to be with someone who made more money, although late in high school she had told C. she should be with someone else if she was unhappy with appellant. The victim also wanted C. to leave appellant because he was raping her. Appellant only dropped the victim at her grandmother's house on Tuesdays when she was in high school. She did not have to be at school until later on those mornings. Otherwise, appellant dropped the victim at school. When appellant raped the victim in the morning, she was often late to school; appellant wrote notes for her. The victim had a turtle in her room between second grade and fourth grade. A different turtle had been kept in the den when the victim was in middle school. The victim never drank appellant's alcohol. C. and appellant argued about the type of used car to buy for the victim. Appellant did not want the victim to have a "decent car." The victim did not want appellant at her graduation because she was not comfortable with him. There was no 21-year-old man the victim had wanted to attend her graduation.

The parties stipulated that a defense investigator had spoken to Cassandra in October 10, 2011, and Cassandra said the victim did not want Kaylee and Caitlyn to come into her room in 2010, and Caitlyn "did not want to visit the house or the victim anymore and stopped visits there." The parties also stipulated that Caitlyn told a defense investigator in October 2012, that she "stopped visiting her dad's house regularly because she did not feel welcome by C. and [the victim] was draining her."

## DISCUSSION

Appellant contends that the trial court erred in admitting the recording of the cell phone call he made to C. As he argued below, he maintains that admission of the recording violated section 632, subdivision (d), his reasonable expectation of privacy under the Fourth Amendment and his right to counsel under the Fifth and Sixth Amendments. We conclude otherwise.

1.    *Abrogation of Invasion of Privacy Act, Penal Code section 630 et seq.*

Appellant contends the trial court violated the Invasion of Privacy Act (§ 630 et seq.), by admitting C.'s audio recording. The Invasion of Privacy Act, enacted in 1967

13

(Stats. 1967, ch. 1509, p. 3584, § 1), regulates wiretapping and electronic eavesdropping, and prohibits the electronic eavesdropping or recording of any "confidential communication" absent consent of all parties to the communication.[4] (*Kight v. CashCall, Inc.* (2011) 200 Cal.App.4th 1377, 1388; *People v. Chavez* (1996) 44 Cal.App.4th 1144, 1148.) With specified exceptions, the statute bars admission of any recorded confidential communication in a judicial proceeding. (§ 632, subd. (d).) Two exceptions are pertinent here: the law enforcement exception (§ 633),[5] and the evidentiary exception (§ 633.5).[6]

Appellant maintains that the trial court erred in admitting C.'s audio recording under either exception. Regarding this contention, the record discloses that during the hearing on the motion to suppress, the parties stipulated that C. made the recording at the direction of Detective Lopez. The purpose of making the recording was to try to obtain an admission from appellant that he had committed a sexual offense against the victim. The prosecutor argued that the recording fell within the exceptions stated in sections 633.5, and 633. At the hearing, the court bypassed the parties' arguments regarding applicability of the exceptions. It found the recording admissible because the statutory

---

[4] A "confidential communication" is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto . . . ." (§ 632, subd. (c).)

[5] Section 633 provides that, nothing in section 632 prohibits "any sheriff, undersheriff, or deputy sheriff regularly employed and paid in that capacity by a county, . . . or any person acting pursuant to the direction of one of these law enforcement officers acting within the scope of his or her authority, from . . . recording any communication that they could lawfully . . . record . . . ," and nothing in section 632 "renders inadmissible any evidence obtained by the above-named persons by means of . . . recording any communication that they could lawfully . . . record . . . ."

[6] Section 633.5 provides that, nothing in section 632 "prohibits one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of the crime of . . . any felony involving violence against the person," or "renders any evidence so obtained inadmissible in a prosecution for . . . any felony involving violence against the person . . . ."

14

exclusionary rule contained in section 632 was abrogated by passage of Proposition 8, and concluded it was bound by federal Fourth Amendment law. These issues were recently addressed by our colleagues in Division Four in *People v. Algire* (2013) 222 Cal.App.4th 219 (*Algire*), a decision published after briefing was completed here. Rather than reinvent the wheel, we draw extensively on that thorough and well-reasoned opinion.

"'[I]n 1982, the California voters passed Proposition 8. Proposition 8 enacted article I, section 28 of the California Constitution, which provides in relevant part: "Right to Truth-in-Evidence. Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial . . . motions and hearings . . . ." (Cal. Const., art. I, § 28, subd. (f), par. (2).)' [Citation.] The 'Truth-in-Evidence' provision in subdivision (f), paragraph (2), of article I, section 28 of the California Constitution (article 1, 28(f)(2)) 'was intended to permit exclusion of relevant, but unlawfully obtained evidence, only if exclusion is required by the United States Constitution . . . .' (*In re Lance W.* (1985) 37 Cal.3d 873, 890 (*Lance W.*).) Section 28(f)(2) is applicable not only to judicially created rules of exclusion [citation], but also to statutory evidentiary restrictions [citations]." (*Algire*, *supra*, 222 Cal.App.4th at p. 227.)

In *Algire*, *supra*, 222 Cal.App.4th 219 the defendant began sexually abusing his stepdaughter when she was 17, shortly after she came to the United States from China to live with her mother and defendant, who had recently married. The victim, who wanted to obtain her green card, had a practice of recording conversations to advance her English skills. (*Id.* at p. 223.) In one conversation recorded on the victim's cell phone without the defendant's knowledge, the defendant stated that the last time he had touched the victim she "was not 'wet at all' and that he believed that she needed instruction in sex from him because her body did 'not understand what [was] happening.'" (*Ibid.*)

Before trial, the defendant objected to the admission of the audio recording on the basis of section 632. The prosecutor argued that the recording fell within the exception

for felonies involving violence against the person (§ 633.5) or, alternatively, that Proposition 8 abrogated the statutory rule requiring exclusion of such evidence. (*Algire*, *supra*, 222 Cal.App.4th at pp. 226–227.) The appellate court addressed only the former ground. (*Id*. at p. 227.)

*Algire*, *supra*, 222 Cal.App.4th 219 confronted the following issue. "[I]n 1985, the Legislature enacted the Cellular Radio Telephone Privacy Act of 1985 (1985 Act). (Stats 1985, ch. 909, p. 2900.) The focal element of that legislation is Penal Code section 632.5, which prohibits the interception of cellular telephone communications, absent specified circumstances. [Citation.] In enacting the statute, the Legislature also amended section 632 and related statutes to reflect the addition of section 632.5, without making substantial changes to the wording of the exclusionary rule set forth in subdivision (d) of section 632. At least two-thirds of the members of each house of the Legislature voted in favor of the 1985 Act." (*Algire*, at p. 228, fns. omitted.) At issue in *Algire* was whether the 1985 enactment revived the exclusionary rule of section 632, subdivision (d), previously abrogated by section 28(f)(2). (*Ibid*.)

Guided by the Supreme Court's analysis in *Lance W*., *supra*, 37 Cal.3d 873, the court in *Algire*, *supra*, 222 Cal.App.4th 219 found no legislative intent to resuscitate the abrogated exclusionary rule of section 632, subdivision (d). (*Algire*, at p. 230.) The 1985 Act reflected a declaration of legislative intent focused exclusively on the need to protect private cell phone communications. (Stats.1985, ch. 909, § 2, pp. 2900–2901 ["[T]his act is intended to provide recourse to those persons whose private cellular radio telephone communications have been maliciously invaded by persons not intended to receive such communications"].) The court observed that the narrow scope of the Legislature's intent was further illustrated by section 632.5 itself, the primary element of the 1985 Act. "That provision discloses no intent to nullify the operation of Proposition 8, as it contains no provision akin to subdivision (d) of section 632 establishing an exclusionary rule." (*Algire*, at p. 230.)

As a result, the audio recording of the cell phone conversation between the victim and defendant was excludable only under the federal rule applicable to evidence seized in

16

violation of the Fourth Amendment. (*Algire*, *supra*, 222 Cal.App.4th at pp. 229–230; *Lance W.*, *supra*, 37 Cal.3d at p. 896.) Because the victim in *Algire* had not recorded the conversation while acting as a government agent, the defendant's Fourth Amendment interests were not implicated. (*Algire*, at p. 230; see also *Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 333; *Zhou v. Pittsburg State University* (D.Kan. 2003) 252 F.Supp.2d 1194, 1203–1204 [under 18 U.S.C. § 2511(2)(d), recordings of conversation between private individuals made with consent of one party to conversation is admissible].)

The same principles obtain here. The only distinction between this case and *Algire*, *supra*, 222 Cal.App.4th 219 is that in *Algire*, there was no question the recorded conversation was between two private individuals.[7] Here the parties stipulated that C. acted "under the direction of" the LASD when she recorded her cell phone conversation with appellant.[8] Thus, the question is whether federal law required exclusion of the recording. (*Lance W.*, *supra*, 37 Cal.3d at p. 896.)

---

[7] If she were not, appellant's Fourth Amendment interests would not be implicated. (*Algire*, *supra*, 222 Cal.App.4th at p. 230.)

[8] The trial court also found the recording admissible on the ground that C. acted as an agent of law enforcement. We need not address the propriety of this ruling, as the recording was admissible on the alternative ground articulated by the trial court. We affirm the trial court's rulings, not its reasoning and will affirm on any theory properly established by the record. (*People v. Mason* (1991) 52 Cal.3d 909, 944; *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18–19.)

*2.    No Fourth Amendment violation*

As pertinent here, the Fourth Amendment protects ones oral conversations from the "uninvited ear," unless one of the parties to the conversation consents to the eavesdropping or recording. (*Katz v. United States* (1967) 389 U.S. 347, 352 [88 S.Ct. 507, 19 L.Ed.2d 576]; *People v. Murphy* (1972) 8 Cal.3d 349, 359, fn. 9 (*Murphy*) ["one party to a telephone conversation may constitutionally allow another to listen to" and record it]; *People v. Windham* (2006) 145 Cal.App.4th 881, 891–892.)

*Murphy*, *supra*, 8 Cal.3d 349 guides our analysis. There, the defendant argued that, although he may not have had a reasonable expectation that informants would not testify to their conversations with him in court, he did have a reasonable expectation their conversations were not simultaneously being heard and recorded by the police. (*Id.* at p. 360.) The California Supreme Court saw "no distinction between the risk one faces that the person in whom he confides will later breach that trust by testifying about the conversation and the risk that such person has already betrayed him and is instantaneously transmitting their conversation electronically to police equipped with radio receivers." (*Ibid; accord United States v. White* (1971) 401 U.S. 745, 751 [91 S.Ct. 1122, 28 L.Ed.2d 453]; *Lopez v. United States* (1963) 373 U.S. 427, 439 [83 S.Ct. 1381, 10 L.Ed.2d 462].)

Similarly, appellant had no reasonable expectation that C. would not breach his trust. In *Lopez v. United States*, *supra*, 373 U.S. 427, the United States Supreme Court rejected a claim similar to the one urged here, stating: "Stripped to its essentials, petitioners argument amounts to saying that he has a constitutional right to rely on possible flaws in the [Internal Revenue] agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible to impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory. We think the risk that petitioner took in offering a bribe to [the agent] fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." (*Id.* at p. 439, fn. omitted.) Here, appellant was well aware of the risks

18

involved in confiding in C., and willingly assumed the risk that she could "divulge the contents of that conversation, and should that happen, there has been no violation of the right of privacy." (*Smith v. Cincinnati Post & Times-Star* (6th Cir. 1973) 475 F.2d 740, 741.) Accordingly, appellant's Fourth Amendment claim fails.

Federal statutory law is in accord. (See 18 U.S.C. § 2511(2)(c) ["It shall not be unlawful . . . for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception"]; 18 U.S.C. § 2511(2)(d) [party to communication not acting under color of law may intercept communication except for purpose of committing criminal or tortious act]; *Zhou v. Pittsburg State University* (D. Kan. 2003) 252 F.Supp.2d 1194, 1203–1204 [evidence obtained in contravention of Pen. Code, § 632, but which does not violate 18 U.S.C. § 2511(2)(d), is admissible in non-diversity action].) Appellant's Fourth Amendment claim fails.

*3.    No Fifth Amendment violation*

Appellant argues that the audio recording was the product of "badgering" by C. who was on a mission on behalf of the police intended to get appellant to incriminate himself.

With respect to the scope of our review as to whether a *Miranda* violation occurred, "'We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.' [Citations.] We apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda*. [Citations.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)

*Illinois v. Perkins* (1990) 496 U.S. 292 [110 S.Ct. 2394, 110 L.Ed.2d 243] (*Perkins*) is instructive. In *Perkins*, the United States Supreme Court held that *Miranda* was not implicated by a conversation between an incarcerated suspect and an undercover

agent posing as a fellow inmate.  No *Miranda* warning was given before the conversation.  "It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation . . . .  When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners." (*Perkins*, at p. 297.) "Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist." (*Ibid*.)

A similar conclusion was reached in *People v. Williams* (1988) 44 Cal.3d 1127, in which the California Supreme Court held that *Miranda* "has never been applied to conversations between an inmate and an undercover agent." (*Williams*, at pp. 1141–1142.)  As the court explained:  "This is because *Miranda* warnings serve to dispel the coercive effect of police custodial questioning.  Both adjectives are crucial:  *Miranda* does not apply to noncustodial police interrogation or to nonpolice custodial interrogation.  When a defendant talks to a fellow inmate, the coercive atmosphere of custodial police interrogation is absent." (*Id*. at p. 1142, italics omitted.)  Nor, for purposes of the Fifth Amendment analysis, does it matter that appellant did not know C. was acting at or under the direction of the police when he spoke with her.  As explained in *Perkins*, *supra*, 496 U.S. 292, "Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. . . .  [¶]  It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation." (*Perkins*, at p. 296.)

These principles are well illustrated by *People v. Plyler* (1993) 18 Cal.App.4th 535 (*Plyler*).  There, the defendant was arrested for child molestation and asserted his right to counsel.  While in jail, defendant called the victim's grandmother who told the police about the call.  With the grandmother's permission, the police attached a recorder to her phone, and instructed the officer in charge of the county jail to tell defendant to "call [the grandmother], collect."  Defendant called the grandmother twice, and spoke

20

with the victim during each call. In one call he made incriminating statements. (*Id*. at pp. 540–541.) The court held that defendant's incriminating statements made during the surreptitiously-recorded conversations were not the product of custodial interrogation within the meaning of *Miranda*. In so holding, the court reasoned that "*Miranda* was designed to protect and preserve an accused's Fifth Amendment privilege against self-incrimination during incommunicado interrogation of individuals in a police-dominated atmosphere." (*Plyler*, at p. 544.) But when "'a suspect does not know that he is conversing with a government agent,'" the pressure to incriminate himself does not exist, and there is no requirement to give *Miranda* warnings. (*Plyler*, at p. 545.) Although appellant claimed his phone call to the victim amounted to "'official intimidation'" and a custodial interrogation, the court found that "one would be hard-pressed to characterize appellant's phone conversations with [the victim] as 'police custodial' interrogation as defined in *Miranda* . . . . Even if appellant had been 'forced' to place the call, he did not know [the victim] was working with the police. Under *Perkins*, [*supra*, 496 U.S. 292,] absent such knowledge there is no reason to assume he might feel coerced and no Fifth Amendment violation occurred." (*Plyler*, at p. 545.)

So too here. Clearly, appellant's statements to C. were not the product of a coercive custodial interrogation within the meaning of *Miranda*. Appellant's statements were freely made several months after he had been released from custody because the district attorney declined to file formal charges, to a person whom he did not believe was acting under the direction of police. (*Perkins*, *supra*, 496 U.S. at p. 297; *Williams*, *supra*, 44 Cal.3d at pp. 1539–1540.)

4.      *No Sixth Amendment violation*

Finally, appellant faults the trial court for violating his Sixth Amendment right to counsel. The asserted right never arose and could not have been violated here.

"The Sixth Amendment right to counsel attaches at the time adversary judicial proceedings are initiated against the accused, such as when the defendant is indicted or arraigned. [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 987, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 420, fn. 22.) "Hence, an

21

uncharged suspect undergoing police questioning possesses no such Sixth Amendment right." (*People v. DePriest* (2007) 42 Cal.4th 1, 33; *Davis v. United States* (1994) 512 U.S. 452, 456–457 [114 S.Ct. 2350, 129 L.Ed.2d 362].)  As explained in *People v. Woods* (2004) 120 Cal.App.4th 929, "[U]ntil such time as the ""'government has committed itself to prosecute, and . . . the adverse positions of the government and defendant have solidified,'"" the Sixth Amendment right to counsel does not attach.  [Citation.]" (*Id.* at p. 940.)  "'Any other [result] would be inconsistent with the United States Supreme Court's recognition that, before the formal instigation of charges, the investigative functions of the police should not be "unnecessarily frustrate[d]" by overprotective application of the Sixth Amendment.  [Citations.]'" (*Id.* at p. 941.)

C.'s recording was made before formal charges were filed.  No Sixth Amendment violation occurred.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, Acting P. J.

MILLER, J.[*]


---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


22